PHOUMY KAM, APPELLEE, V. IBP, INC., APPELLANT.

686 N.W.2d 631

Filed September 21, 2004.   No. A-03-481.

Bruce M. Smith for appellant.

Rod Rehm and Todd Bennett, of Rehm & Bennett Law Firm, for appellee.

IRWIN, Chief Judge, and SIEVERS and INBODY, Judges.

INBODY, Judge.

## INTRODUCTION

IBP, inc., appeals from the Workers' Compensation Court review panel's affirmance of the workers' compensation trial court's award to Phoumy Kam of temporary partial disability and temporary total disability benefits for an injury she incurred while employed by IBP. For the reasons set forth herein, we affirm in part, and in part reverse and remand for a correct award.

## STATEMENT OF FACTS

Kam was born in 1945, and she emigrated from Laos to the United States when she was 35. In 1991, she began working for IBP at its plant in Lexington, Nebraska. On January 13, 1998, Kam was performing a job that required her to pick up meat from a conveyor belt and place it on another conveyor belt. At one point, when she was throwing a piece of meat onto the second conveyor belt, she heard a "pop" and felt a sharp pain in her right arm. At the time of the injury, Kam's average weekly wage was $369.59 for temporary indemnity purposes and $372 for permanent indemnity purposes. Kam notified her supervisor of the injury and was taken to see a nurse; however, Kam did not consult a physician until she saw Dr. Mark Jones on March 3. She was further examined by Dr. W. Michael Walsh, who recommended surgery on her right shoulder. Surgery was performed on her right shoulder and biceps area on July 2. This surgery did not alleviate the pain in Kam's shoulder.

As a result of this pain, and the operation, Kam's duties at IBP were restricted. On July 16, 1998, Dr. Walsh allowed Kam to return to work in a "runner" position, in which she was not to use her right arm. At a recheck appointment on August 13, Dr. Walsh did not change these restrictions. At Kam's next recheck appointment, on September 24, Dr. Walsh commented that her recovery was progressing more slowly than expected and noted that she should "work in an environment that's not as cold to see if this would decrease her symptoms at work." Dr. Walsh again evaluated Kam's restrictions on November 19 and noted that she "[n]eed[ed] to limit weight and positions in which she use[d]" her right arm and that she was not to lift anything over 10 pounds or use her arms above shoulder height.

On December 23, 1998, Kam was examined by Dr. Ian Crabb, who began to care for Kam when Dr. Walsh stopped seeing patients in Lexington. Dr. Crabb noted that Kam was working "doing finger meats[,] which is her regular job," and put her on a 6-hour workday limit. On January 21, 1999, Dr. Crabb again examined Kam and noted that she had "tremendous pain of the right shoulder and neck radiating down the arm." At that point, Dr. Crabb planned a manipulation under anesthesia to alleviate Kam's shoulder pain, as well as a surgical procedure to address carpal

tunnel symptoms she had developed. Dr. Crabb performed the manipulation and surgery on February 3. On April 1, Dr. Crabb approved Kam to "return . . . to her job via [a] work hardening program." On May 27, Dr. Crabb again evaluated Kam and removed all work restrictions, finding her to be at maximum medical improvement.

Dr. Crabb saw Kam again on June 17, 1999, noting that she remained in "quite severe pain"; however, at that time, Dr. Crabb felt that additional surgery would not help Kam's condition. In July, Dr. Crabb notified IBP that Kam had sustained permanent disability of 15 percent in her right upper extremity. Kam was again examined by Dr. Crabb on October 28. Dr. Crabb noted that Kam had "continued decreased [range of motion] and pain in the shoulder," but he again believed that surgery would not be beneficial. In response to an inquiry by IBP on May 3, 2000, Dr. Crabb noted that the amount of work Kam did with her right arm "exacerbat[ed] her chronic pain" and that "although she can use the right arm, the frequency should be decreased." On May 4, Dr. Crabb examined Kam for a "final follow-up of her right shoulder pain" and found that she had continued pain and decreased range of motion; further, Dr. Crabb noted that he would "go ahead and write for a permanent restriction for the right arm with no repetitive use."

At trial, Kam testified that her arm did not feel any better after the surgery on her shoulder in July 1998; in fact, she said that her condition was worsened by the surgery. Kam indicated that when she returned to IBP after the surgery, she had new work restrictions. She was given a delivery job for 6 weeks and a box labeling job for 2 weeks. Thereafter, she was told to perform the above-mentioned "finger meat" job, despite the fact that she complained that she was still in severe pain. After Kam complained that the "finger meat" job caused her too much pain, her position was changed to picking up fat off of a conveyor belt.

Kam further testified that she continued to see a doctor after her first surgery. After a week off from work following her surgery for carpal tunnel syndrome in February 1999, at which time her shoulder was also worked on again, she returned to IBP and was placed on a "pick trim" job, which involved picking up shank meat off of a conveyor belt. Kam testified that the "pick trim" job

was harder for her to perform because the pieces of meat were bigger and because she had "to use one hand and a lot of times the belt would stop." She said that she performed this job or the job picking up fat off of a conveyor belt until she quit on September 2, 2000. Kam also indicated that her shoulder felt no better after her 1999 surgery, that her pain was so severe that she could not bear it anymore, and that the pain caused her to "sit around the house and cry." She indicated that she had to take pain pills three times a day due to the pain in her shoulder and that she had not worked since leaving IBP because she did not think she could handle it.

On cross-examination, Kam testified that she could no longer lift her right arm over her head due to pain in her shoulder. She further testified that she had asked the nurse at IBP for icepacks, ice bags, or pain killers, but that these requests were denied. She again said that her shoulder had not gotten any better after either surgery and reported that she still suffered pain and stiffness in her right arm. She indicated that she did not believe she could work anymore and that "any job is out of the question."

Margaret Fagot, the medical case manager at IBP in Lexington, testified next. She indicated that Dr. Crabb had approved the "pick trim" job for Kam and that the position was one that accommodated Kam's restrictions. Fagot further testified that Dr. Crabb had approved the "finger meat" job for Kam, but that Kam said she could not perform that job because it caused her too much pain. On cross-examination, Fagot agreed that Kam had appeared to be "giving an effort" in performing her duties and that Kam, according to a "Claim Comments" document, had resigned from IBP due to the pain she encountered while working.

After all evidence was adduced, the Workers' Compensation Court entered its decision. The court found that Kam was temporarily partially disabled from March 3 through July 1, 1998 (17²/₇ weeks); was temporarily totally disabled from July 2 through 16, 1998 (2¹/₇ weeks); and was temporarily partially disabled from July 17, 1998, through February 2, 1999 (28⁵/₇ weeks). Her total period of temporary partial disability was thus found to be 46 weeks. The court further found:

> With the actual restrictions of Dr. Walsh, and the testimony and history given by [Kam] with respect to her ability

to work . . . at best, [Kam] should have remained in the "runner position" . . . prior to November 19, 1998. This becomes important when the extent of [Kam's] loss of earning power for this period of temporary partial disability is discussed below at paragraph V.

The court also found:

> [Kam] testified in a believable and credible manner that one of her supervisors had told her that her injury was not as severe and she could do normal work. She testified that for 6 weeks she delivered orders to the kill floor (the "runner position"), then for two weeks she labeled boxes, mainly using her left hand. . . . Within two months (by September 2, 1998) of her shoulder surgery, [Kam] was doing the finger meats job, even though Dr. Walsh had not released her to do so. It was this environment which was cold, and which was essentially restricted from [Kam's] release to return to work, as of September 24, 1998. As a result, prior to November 20, 1998, the only position suitable for [Kam] to work was the "runners [sic] position."

The court explained its finding that Kam was temporarily partially disabled from November 20, 1998, through February 2, 1999, by noting that she had significant lifting restrictions and that she "was never able to progress to working an 8 hour day." Further, the court found that because Kam was temporarily partially disabled with extremely significant restrictions during this timeframe, she "had a 100 percent loss of earning power." The court explained,

> after reviewing all the evidence for the periods of time for which [Kam] was temporarily partially disabled, that pursuant to Cords v. City of Lincoln, 249 Neb. 748, 545 N.W.2d 112 (1996); and, Sidel v. Travelers Ins. Co., 205 Neb.541, 288 N.W.2d 482 (1980), [Kam] had a 100 percent loss of earning power. At the most, [Kam] had the physical ability to hold a part time, or odd lot position. This results in her entitlement to $246.39 per week for 46 weeks for temporary partial disability.

The court further found that Kam was temporarily totally disabled from February 3 through May 27, 1999 (16²/₇ weeks). Thus, the court found that the total time she was temporarily totally

disabled was 18³/₇ weeks. The court then held that Kam reached maximum medical improvement on May 28, 1999, and that she "sustained a permanent partial disability to her right upper extremity of 11 percent."

Both Kam and IBP filed applications for review on August 13, 2002. The Workers' Compensation Court review panel noted that IBP's "primary argument . . . addressed the award of a 100 percent loss of earning power during periods of temporary partial disability when [Kam] returned to work in accommodated positions and worked six hours per day and sometimes full time." In addressing this argument, the review panel found:

> We generally agree with [IBP's] argument that an award of 100 percent loss of earning during a period of temporary partial disability provides a disincentive for employers to accommodate injured employees in light duty employment. We further acknowledge that an employee who returns to part time light duty work and receives a 100 percent loss of earning power during the period of temporary partial disability may receive a windfall. Conversely, a non English speaking employee, with few transferable job skills, physical restrictions, whether temporary or permanent, and living in Lexington, Nebraska has very real employment issues and may well be a temporary odd lot employee as defined by our jurisprudence. If an injured employee with permanent impairment and restrictions, working part time[,] may be an odd lot employee entitled to permanent total disability, we see no logical reason why the same standards may not be applied to an injured employee with temporary partial disability.

Accordingly, the review panel affirmed the award of the trial court in its entirety.

IBP has timely appealed to this court.

## ASSIGNMENTS OF ERROR

On appeal, IBP alleges that the Workers' Compensation Court was clearly wrong in its determination of the periods of Kam's temporary partial disability and that the court erred in awarding Kam a 100-percent loss of earning power during periods of temporary partial disability.

## STANDARD OF REVIEW

■ An appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Mabile v. Drivers Mgmt., Inc.*, 11 Neb. App. 765, 660 N.W.2d 537 (2003).

■ In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court review panel, a higher appellate court reviews the findings of the single judge who conducted the original hearing. *Brummer v. Vickers, Inc.*, 11 Neb. App. 691, 659 N.W.2d 838 (2003). Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Id.*

■ If the record contains evidence to substantiate the factual conclusions reached by the trial judge in workers' compensation cases, an appellate court is precluded from substituting its view of the facts for that of the compensation court. *Noordam v. Vickers, Inc.*, 11 Neb. App. 739, 659 N.W.2d 856 (2003). Regarding questions of law, an appellate court in workers' compensation cases is obligated to make its own determinations. *Id.*

## ANALYSIS

*Periods of Temporary Partial Disability.*

■ IBP first alleges that the trial court was clearly wrong in determining Kam's periods of temporary partial disability. "Whether a claimant has sustained disability which is total or partial and which is temporary or permanent is a question of fact." *Miller v. E.M.C. Ins. Cos.*, 259 Neb. 433, 440, 610 N.W.2d 398, 406 (2000). As noted above, "[u]pon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong." *Brummer*, 11 Neb. App. at 697, 659 N.W.2d at 844.

The trial court first found that Kam was temporarily partially disabled from March 3 through July 1, 1998, for a total of $17^2/_7$ weeks. March 3 was the first time Kam sought medical treatment

for her shoulder injury; July 1 was the day before Kam's first surgery. After examining her on March 3, Dr. Jones did allow Kam to return to work, but with the restriction that she was not to use her right arm. It appears from the record that the trial court strongly considered this fact in determining that Kam continued to be temporarily partially disabled after she returned to work.

The court next found that Kam was temporarily partially disabled from July 17, 1998, through February 2, 1999, for a total of 28⅗ weeks. July 17, 1998, was the first day that Kam was released to return to work after her first surgery, and February 2, 1999, was the day before Kam's second surgery. The record shows that on July 16, 1998, Dr. Walsh wrote a release for Kam to return to work the next day in what he referred to as a "runner" position, without the use of her right arm. The trial court further found that

> [w]ithin two months (by September 2, 1998) of her shoulder surgery, [Kam] was doing the finger meats job, even though Dr. Walsh had not released her to do so. It was this environment which was cold, and which was essentially restricted from [Kam's] release to return to work, as of September 24, 1998. As a result, prior to November 20, 1998, the only position suitable for [Kam] to work was the "runners [sic] position."
>
> From November 20, 1998, through February 2, 1999, [Kam] remained temporarily partially disabled, with very significant lifting restrictions. . . . Prior to February 3, 1999, when [Kam] once again became temporarily totally disabled, [Kam] was never able to progress to working an 8 hour day.

Accordingly, the trial court found that Kam was temporarily partially disabled during this timeframe, due at least in part to her "extremely significant restrictions."

██ Neb. Rev. Stat. § 48-121(2) (Reissue 1998) provides for compensation for those with "disability partial in character." The Nebraska Supreme Court has explained that

> [a]n employee's disability as a basis for compensation under § 48-121(1) and (2) is determined by the employee's diminution of employability or impairment of earning power or earning capacity and is not necessarily determined by a

> physician's evaluation and assessment of the employee's loss of bodily function. . . . Earning power, as used in § 48-121(2), is not synonymous with wages, but includes eligibility to procure employment generally, ability to hold a job obtained, and capacity to perform the tasks of the work, as well as the ability of the worker to earn wages in the employment in which he or she is engaged or for which he or she is fitted.

(Citation omitted.) *Zavala v. ConAgra Beef Co.*, 265 Neb. 188, 199, 655 N.W.2d 692, 701 (2003).

IBP argues that the trial court erred by finding that Kam was temporarily partially disabled from March 3 through July 1, 1998, because "[t]here is no indication in the record that Kam worked anything less than fulltime during this period or that she received reduced wages." Brief for appellant at 8. However, the trial court did not make such a determination when finding that Kam was temporarily partially disabled at that time. The court noted that Kam was unable to use her right arm, and this restriction could be sufficient to diminish her earning capacity, as defined by our jurisprudence. Thus, as we are unable to say that the trial court was clearly wrong in its determination that Kam was temporarily partially disabled from March 3 through July 1, 1998, we affirm the review panel's affirmance of this portion of the trial court's decision.

IBP also alleges that the trial court erred in finding Kam to be temporarily partially disabled from July 17, 1998, through February 2, 1999. Again, the record is factually sufficient to indicate that Kam's earning power was diminished during this time, as a result of her physical restrictions. Thus, we are unable to say that the trial court was clearly wrong when it determined that Kam was temporarily partially disabled during the timeframe in question. Accordingly, we affirm the review panel's affirmance of the trial court's finding that Kam was temporarily partially disabled from July 17, 1998, through February 2, 1999.

*Award of 100-Percent Loss of Earning Power.*

 IBP next alleges that the trial court erred when it awarded Kam a 100-percent loss of earning power during her periods of temporary partial disability. As stated earlier:

> Earning power, as used in § 48-121(2), is not synonymous with wages, but includes eligibility to procure employment generally, ability to hold a job obtained, and capacity to perform the tasks of the work, as well as the ability of the worker to earn wages in the employment in which he or she is engaged or for which he or she is fitted.

*Zavala*, 265 Neb. at 199, 655 N.W.2d at 701. Further, "[i]f an employee, after a work-related injury, receives wages equal to or greater than the wages received before the injury, the wages may be considered in the determination whether an employee has sustained an impairment of earning capacity." *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 471, 461 N.W.2d 565, 574 (1990).

The trial court found, in assessing the proper amount of Kam's loss of earning power:

> It is this Court's determination, after reviewing all the evidence for the periods of time for which [Kam] was temporarily partially disabled, that pursuant to <u>Cords v. City of Lincoln</u>, 249 Neb. 748, 545 N.W.2d 112 (1996); and, <u>Sidel v. Travelers Ins. Co.</u>, 205 Neb.541, 288 N.W.2d 482 (1980), [Kam] had a 100 percent loss of earning power. At the most, [Kam] had the physical ability to hold a part time, or odd lot position. This results in her entitlement to $246.39 per week for 46 weeks for temporary partial disability.

"A determination as to whether an injured worker has had a loss of earning power is a question of fact to be determined by the Workers' Compensation Court." *Frauendorfer v. Lindsay Mfg. Co.*, 263 Neb. 237, 247, 639 N.W.2d 125, 136 (2002). Thus, we will not reverse the review panel's affirmance of the trial court's determination unless it is clearly wrong.

The trial court appears to determine based on *Cords v. City of Lincoln*, 249 Neb. 748, 545 N.W.2d 112 (1996), and *Sidel v. Travelers Ins. Co.*, 205 Neb. 541, 288 N.W.2d 482 (1980), that Kam suffered a 100-percent loss of earning power. However, a closer reading of those two cases indicates that they do not require, or even support, the result reached by the trial court. In *Cords*, the Nebraska Supreme Court affirmed a finding that a 60-year-old man who had been permanently disabled on the job

and who had limited education and work experience had suffered a 10-percent loss of earning capacity. In *Sidel*, a 41-year-old man was permanently disabled while working; the Nebraska Supreme Court upheld an award from the Workers' Compensation Court finding that he had suffered a 20-percent loss of earning capacity. In contrast to the instant case, in both *Sidel* and *Cords*, the worker had suffered permanent disabilities. More importantly, in neither case did the Workers' Compensation Court find that the worker had suffered a 100-percent loss of earning power.

Recently, in *Frauendorfer, supra*, the Nebraska Supreme Court dealt with the issue of temporary partial disability. Much like Kam in the instant case, the worker in *Frauendorfer* worked fewer hours after his injury than he was able to prior to his injury; he also earned a reduced wage, unlike Kam. The Supreme Court "defined temporary disability as the period during which the employee is submitting to treatment, is convalescing, is suffering from the injury, and is unable to work because of the accident." *Id.* at 245, 639 N.W.2d at 134-35. After noting that the worker was able to work fewer hours and earned a lower hourly wage after his injury than prior thereto, the Supreme Court affirmed the trial court's finding that the employee had a 30-percent temporary partial disability; the trial court made this finding in reliance on a report that the employee "would have a 30-percent loss of earning capacity if he were restricted to an 8-hour shift" with his employer. *Id.* at 246, 639 N.W.2d at 135.

Kam suggests that the reasoning in *Frauendorfer* supports her contention that the trial court did not err when it found that she had lost 100 percent of her earning capacity. We do not believe this to be true. Unlike the trial court in *Frauendorfer*, the trial court in the instant case found that Kam, although working for a wage similar to what she earned preinjury, albeit for fewer hours, lost 100 percent of her earning capacity. Logic dictates that this is simply not possible. During all times that the trial court found Kam to be temporarily partially disabled, she continued to work at IBP. No evidence in the record indicates that she received a lower hourly wage after her injury than she did prior to her injury, although there is evidence that she was unable to work as many hours postinjury as she did preinjury.

■ Kam also suggests that the instant case is similar to *Schlup v. Auburn Needleworks*, 239 Neb. 854, 479 N.W.2d 440 (1992). In *Schlup*, the Nebraska Supreme Court noted that " '[u]nder the odd-lot doctrine, which is accepted in virtually every jurisdiction, total disability may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well-known branch of the labor market.' " 239 Neb. at 865, 479 N.W.2d at 448 (quoting 2 Arthur Larson, The Law of Workmen's Compensation § 57.51(a) (1989)). The Supreme Court found that "[a]lthough [the plaintiff] might be physically able to perform some of the requirements of the jobs listed by [the rehabilitation counselor], the compensation court could properly find that her lack of mental abilities, coupled with her physical limitations, did render her unemployable." *Id.* The difference between *Schlup* and the instant case is that the plaintiff in *Schlup* was totally and permanently disabled, whereas Kam's disability was temporary and partial. We find no cases applying the odd-lot doctrine to temporary disability, and we decline to so apply the doctrine in the instant case.

■ We acknowledge that wages and earning capacity are not the same thing; however, we find as a matter of law that when dealing with temporary partial disability, one cannot be earning wages at a similar job with the same employer and at the same time have suffered a 100-percent loss of earning capacity. This seems even more clear when one considers the proposition that "[i]f an employee, after a work-related injury, receives wages equal to or greater than the wages received before the injury, the wages may be considered in the determination whether an employee has sustained an impairment of earning capacity." *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 471, 461 N.W.2d 565, 574 (1990). Further, "partial disability" is defined as "[a] worker's inability to perform all the duties that he or she could do before an accident, even though the worker can still engage in some gainful activity on the job." Black's Law Dictionary 474 (7th ed. 1999). Reason does not allow one to reconcile a 100-percent loss of earning capacity with an ability to "engage in some gainful activity on the job," which ability Kam clearly had,

since she kept working for IBP at the same hourly wage, albeit in a different position, as she had preinjury.

This is not to say that Kam did not suffer any loss of earning capacity. Rather, we hold that the Workers' Compensation Court erred when it found, in determining the amount of her benefits while she was temporarily partially disabled, that she had lost 100 percent of her earning capacity. Accordingly, we reverse the review panel's affirmance of the compensation court's decision on this issue and remand the cause for a correct award of temporary partial disability, which in this case is essentially a mathematical calculation of wages, earned by Kam while she was temporarily partially disabled, as a percentage of her preinjury earnings.

## CONCLUSION

We find that the trial court was not clearly wrong when it found that Kam was temporarily partially disabled from March 3 through July 1, 1998, and from July 17, 1998, through February 2, 1999. Further, we find that the trial court erred when it found that Kam had a 100-percent loss of earning power during these periods of temporary partial disability. Thus, we affirm in part and in part reverse. The cause is remanded to the Workers' Compensation Court review panel for further remand to the trial court for a correct award of temporary partial disability.

AFFIRMED IN PART, AND IN PART
REVERSED AND REMANDED.